Milton Albert, J.
This is a claim for the appropriation of claimant’s land pursuant to sections 30 and 349-c of the Highway Law, which proceeding is described as City of Albany, Lark-Dove Arterial Highway, Albany County, Map No. 97, Parcel No. 101 (fee) and Map No. 144, Parcel No. 102 (temporary easement).
The aforesaid maps and descriptions were filed in the office of the County Clerk of Albany County on September 28, 1967.
The claim was filed with the Clerk of the Court of Claims and the Attorney-General on June 24, 1969, and has not been assigned or submitted to any other court or tribunal for audit or determination.
The court adopts the descriptions of the appropriated property as shown on the maps and descriptions filed in the Albany County Clerk’s office, copies of which are attached to the claim and same are incorporated herein by reference.
Claimant was the owner of the property by reason of a deed dated May 26, 1941, from Thomas F. and Martha A. Grattan, grantors, to Santa Akullian, grantee, recorded in the Albany County Clerk’s office on May 26, 1941, in Liber 930 of Deeds at page 362.
Prior to the appropriation, the claimant owned a rectangularly-shaped parcel of land containing 0.86± acres or 37,513± square feet located on the westerly side of the Loudonville Road (U. S. Route No. 9) in the City of Albany. The parcel had 160± feet of highway frontage and about 250± feet of depth. At the highway the parcel was at grade, but it sloped upwards away from the road. The parcel was improved with a two and one-half story brick residence. The front of the house, elevated as it was on the upward slope of the land,, commanded a very favorable view across Route 9 of the valley before it, which was improved with an attractive golf course immediately adjacent to and on the other side of Route 9. The property was located in one of the most desirable and exclusive residential areas in Albany County.
For the purposes of constructing a portion of the arterial system surrounding the City of Albany, the State appropriated *144 in fee a frontage strip averaging between 13± and 16± feet in depth; and, immediately abutting this fee strip, the State also took a temporary easement between 10± and 12± feet in depth. Contained within the taking were areas of lawn, 400± square feet of driveway, some curb and gutter area, and some shrubbery.
As a result of the taking the setback was reduced, the driveway entrance was changed, access was changed to a one-way service road, and the favorable view of the golf course and the valley was appreciably changed. Route 9 was depressed in elevation about 21 ± feet below its previous level, and a retaining wall was constructed in front of the residence, the service road being between such retaining wall and claimant’s northern property line.
The claimant’s appraiser’s before value was $65,000 and his after value was $52,000. His damages, therefore, were $13,000. Then, he advanced a direct damage of $3,200 for the fee taking. In addition, claimant alleged $483.60 in expenses to relocate his underground electric service and $6,800 as the value of the temporary easement, which was revised to $6,400 at the trial. His damages, therefore, totaled to $23,100 rounded.
The State’s appraiser found a land value of $14,600 before the taking; to this, he added $7,400 as the value of the land; improvements and $30,000 as the value of the house for a total before value of $52,000. After the taking he valued the remaining land at $13,420, the improvements at $6,580 and the building at the same $30,000 for an after value of $50,000. He found only direct damages — $1,180 for the land taken and $820 for the improvements contained therein, or a total of $2,000. To this he added $335 as the rental value of the easement (State’s appraisal, page 19, revised at trial to cover entire period of temporary easement, September 28, 1967 to January 4, 1973).
The court viewed the property after trial and after completion of the improvement.
After careful consideration of the testimony at the trial, the appraisals and exhibits in evidence, the demeanor of the witnesses, and the court’s view of the subject property, the court finds as follows :
1. HIGHEST AND BEST USE
The highest and best use of the property both before and after the State’s takings was residential,
*145 2. VALUATION OP THE PROPERTY AND DAMAGES CAUSED BY THE state’s PEE TAKING
The claimant’s appraiser developed a before value for the property of $65,000 and then testified that his before land value was $16,000 and that the land was damaged by the direct taking to the extent of 20%. Accordingly, he advanced a direct taking damage of $3,200. After this, he developed an after value of $52,000 and thus a damage figure of $13,000. At this point, he informed the court that both the $13,000 figure and the $3,200 figure were to be considered as damages. He denominated the $3,200 as direct damages and the $13,000 as consequential damage. The court is unable to consider both the $13,000 figure and the $3,200 figure as advanced by the claimant’s appraiser. From the most favorable point of view that can be accorded to this appraisal, the court can consider only the damage between the before and after values and thus the $13,000 figure as including direct and consequential damages as advanced by this appraiser.
During the course of the trial, question arose concerning claimant’s appraiser’s improved sales which were of properties in the general area of the subject property — one including a sale and resale of adjacent improved property (Sales 1-A and 2). It was the claimant’s appraiser’s viewpoint based on all of his improved sales that the subject property had a before value of $65,000. The question which arose during the trial concerned the claimed absence of adjustments in the appraisal whereby claimant’s appraiser would explain how he applied these improved sales in arriving at his opinion as to the before value of claimant’s property. The State’s attorney objected to testimony with respect to adjustments that were not in the appraisal. The court, adhering to its decision in Parisi v. State of New York (62 Misc 2d 378), upheld the State’s attorney’s view and did not permit adjustment testimony over and above what was in the appraisal. The court, at that time, did say that it was self-apparent that the improved sales were in the appraisal to justify before value and that there were some adjustment comments which indicated something of claimant’s appraiser’s thought process. The court finds there was sufficient justification in the claimant’s appraisal to support a before value based on improved sales advanced by him.
The court has considered the claimant’s appraiser’s before value of $65,000 and the residential sales advanced by him (particularly his Sales 1-A and 2) and the State’s appraiser’s before value of $52,000 and the residential sales advanced by *146 him (particularly his Sales A and D). With respect to such Sales A and D, the court finds that the downward adjustments made to these sales were too deep. After appropriately limiting or reducing the extent of such downward adjustments, the court finds that claimant’s appraiser’s sales, with the minimal adjustment information referred to above, and State’s appraiser’s Sales A and D adjusted downward less extensively, justify a finding by the court that the before fair market value of the property was $58,000.
With respect to after fair market value, the court is unable to utilize the $52,000 after value advanced by claimant’s appraiser because there are no adjustments in the appraisal upon which the court may rely for this purpose. Accordingly, the court has no other choice but to go to the State’s appraiser’s after value of $50,000 which the court hereby finds to have been the after fair market value of the subject property. ' Accordingly, there is here a total damage figure of $8,000.
With respect to land value and for purposes of computing direct and consequential damages, the appraisers were quite close, with the claimant’s appraiser at $16,000 and the State’s appraiser at $14,600. The court adopts the claimant’s appraiser’s before land value of $16,000 and the State’s appraiser’s after land value of $13,420 as the before and after fair market values thereof. Also, the court adopts the State’s appraiser’s $820 as the fair market value of the land improvements directly taken.
The direct damage for the fee taking was $1,280 and for the land improvements taken $820. The balance of the court’s $8,000 total damage — namely $5,900 — is attributable to consequential damage which includes the permanent effects of the taking, including adverse effects on remaining improvements (cf. Purchase Hills Realty Assoc. v. State of New York, 35 A D 2d 78, 81, affd. 30 N Y 2d 615)*, with the exception that since a separate cost to cure is being awarded in this decision for the restoration of the underground power line, no consideration has been given here to the effect of the State’s taking on the underground power line and the effect thereof on consequential damage.
3. UNDERGROUND POWER SERVICE ; COST TO CURE
Prior to the State’s taking, claimant’s property enjoyed the advantage of an underground power service. The construction work eliminated this underground service.
*147 Claimant was offered a replacement service which would have been overhead service from a power pole to be erected in front of his property. This he refused to have done and instead obtained a replacement himself by way of a partial underground service. For this he presented a paid bill for $483.60. This the court finds to be a proper and reasonable item of damages and, accordingly, finds that claimant is entitled to an award in such amount for the purpose of restoring underground power service on a cost to cure basis — which, admittedly, is only partial. In so finding, the court, of course, then restricted itself, as stated above, to finding before and after values of the property on the basis that in both situations underground power was available to the property.
4. RENTAL VALUE OF THE TEMPORARY EASEMENT
Claimant’s appraiser in his approach to establish a rental value for the temporary easement developed a before rental value for the entire property at $400 per month. Then, because of what he attributed to the effects of the temporary easement, he developed a $300 per month rental value for the remainder of the property for the duration of the temporary easement. Thus, he arrived at the conclusion that the rental value for the temporary easement was. the difference between these two rental values, namely $100 per month. In this connection, it must be kept in mind that the temporary easement applied to a frontage strip taken for grading backslope which was inside' the fee taking, both of which were along the front of claimant’s property as it abutted the highway and that, accordingly, no part of the remainder of claimant’s land and no part of the residence was involved in either the direct taking strip or the temporary easement strip. Furthermore, claimant at all times during the term of the temporary easement had access to the remainder of his property, albeit at times by temporary circuitous routes and detours, and continued to reside there. In the court’s view, there is a fallacy in claimant’s appraiser’s approach here; he has included in his thought process and approach all of the adverse effects and results of the construction work, detours, etc., that occurred on the original highway bed and on the direct taking strip as well as on the temporary easement strip. He did not allocate portions of his $100 rental difference to any of these three areas; rather, he lumped them all together and ascribed the total effect to the temporary easement. In this court’s view, this involves the inclusion of temporary effects"' of highway construction work and noncompensable damages. The court is unable to adopt this approach in arriving at a
*148 rental value for the temporary easement. Claimant argued that' what was said in Great Atlantic & Pacific Tea Co. v. State of New York (22 N Y 2d 75, 90) is applicable here. The court finds that the fact situation there involved was different in that the temporary easement there prevented the tenant from restoring its store front, which in turn affected the rental value of the store. There is no such proof here that the temporary easement alone had any such effect on the rental value of claimant’s residence — rather all of the effects of the construction work, which were mostly not attributable to the temporary easement itself and the use thereof, were involved. The court finds that the claimant could have advanced the same loss in rental value even if the temporary easement had not been taken. In other words, the highway work and related temporary effects are what caused his claimed diminution in rental value and this is not compensable. For an excellent consideration of the subject type of temporary easement and the determination of a proper rental value therefor (as well as a careful presentation of noncompensable damages in highway construction) see Commonwealth of Kentucky, Dept. of Highways v. Ray (392 S. W. 2d 665, 669).
Accordingly, the court has no alternative but to adopt the State’s appraiser’s revised figure of $335 as the fair rental value of the temporary easement.
5. SUMMARY OF AWARD
The court summarizes its award as follows:

During the course of the trial, motions were made upon which decision was then reserved. In its decision above, the court has indicated its disposition with respect to some of theSe motions. The remainder are now denied.
The claimant is awarded the sum of $8,820 for all damages direct and consequential, with interest thereon from September 28,1967 to March 28,1968 and from June 24, 1969 to the date of entry of judgment herein.

 See, olso, Keinz v. State of New York, 2 A D 2d 415, 417.